[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 06-16505
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 7, 2007
THOMAS K. KAHN
CLERK

D.C. Docket Nos. 05-00362-CV-J-32-TEM & 05-00459-CV-J-2

3:05-cv-00362-TJC-TEM

SIERRA CLUB

Plaintiff-Appellant,

versus

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

Defendants-Appellees,

ST. JOE COMPANY, INTERVENOR,

Intervenor-Appellee.
_____

3: 05-cv-00459-TJC-TEM

NATURAL RESOURCES DEFENSE COUNCIL,

Plaintiff-Appellant,

versus

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

Defendants-Appellees,

ST. JOE COMPANY, INTERVENOR,

Intervenor-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

**(December 7, 2007)**

Before BLACK, HULL and FAY, Circuit Judges.

PER CURIAM:

In this case, we must resolve the question whether the U.S. Army Corps of Engineers (the "Corps") exceeded its authority under the Clean Water Act (the "Act") when it issued a general permit (the "Permit") authorizing all landowners engaged in "suburban development" in a large contiguous area of the Florida panhandle to discharge limited types and amounts of dredged and fill material into some, but far from all, federal waters in the Permit area, pursuant to specific conditions designed to (a) limit development to specific subunits in the Permit area and minimize significantly the environmental impact of that development, and (b) preserve a large portion of the Permit area with no development at all.

The Corps issued the Permit to cover a wide range of activities related to "suburban development" over an expansive (more than 48,000 acres) and

2

contiguous plot of land. The Permit contains a detailed and comprehensive list of special conditions applicable to all suburban development projects in the Permit area. The conditions are intended to preserve intact 10,000 acres of wetlands in the Permit area with no development and to minimize the impact on other wetlands by significantly restricting the scope of permitted activities and reserving for the Corps a mechanism to ensure individual projects comply with the Act. General permits are authorized by Section 404(e) of the Act, which allows their use only when the proposed activities to be governed by the permit are "similar in nature" and will have only minimal impacts on the environment, when considered separately and cumulatively. 33 U.S.C. § 1344(e)(1).

We agree with the district court's reasoning as to these issues. The district court's 115 page manuscript opinion ably sets forth the Appellants' and Appellees' extensive arguments, analyzes in detail the controlling law, evaluates all relevant authorities, carefully considers the uniqueness of this area of Florida, delicately balances the interests of all the competing parties and agonizes over the close nature of the questions presented and the difficulty of the case. Recognizing the accuracy and thoroughness of the analysis performed by the district court and joining in its deep concern over the questions involved, we agree with the district court's reasoning and affirm the ruling for the reasons set forth in this opinion and

the opinion published at 464 F. Supp. 2d. 1171 (M.D. Fla. 2006).

The Corps' authority to issue general permits derives from Section 404(e) of the Act, which states in relevant part:

> [The Corps] may . . . issue general permits on a state, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if [the Corps] determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.

33 U.S.C. § 1344(e)(1). The parties dispute both whether the activities authorized by the Permit are similar in nature and whether the Permit minimizes the separate and cumulative impacts on the environment. While a very close case, the Permit's special conditions effectively cabin the scope of permitted activities and mitigate any environmental impacts such that the Permit is a proper exercise of the Corps' Section 404(e) general permitting authority.[1]

The Permit is replete with special conditions designed specifically to narrow the category of activities authorized by the permit so they are similar in nature, and minimize the environmental effects of development by preserving much of the

---

[1] We agree with the district court that Section 404(e) is ambiguous and that the Corps has issued no formal regulation; thus, we follow the district court and apply the least deferential *Skidmore* standard of review to the Corps' actions. *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161 (1944). Because we uphold the agency's actions, we decline to decide whether *Chevron* deference would apply in this case.

4

area and mitigating adverse effects imposed by the proposed activities.[2] For example, the Permit provides for the preservation and conservation management of 10 conservation units, comprising more than 13,200 acres.[3] Development in these areas is prohibited. The areas may be used only for wetland or habitat mitigation, limited passive recreational purposes, and other prescribed activities. Further, St. Joe Company, which owns most of the land in the permit region, has volunteered to grant perpetual conservation easements to the Florida Department of Environmental Protection on portions of the conservation units.[4]

Additional land will be permanently conserved because the Permit requires that 80% of the wetlands within every sub-basin be preserved and placed into perpetual conservation, leaving 20% available for development (except for those

---

[2] There are a total of 24 special conditions in the general permit. We only highlight a few illustrating the broad powers retained by the Corps.

[3] St. Joe Company, owner of the land on which the conversation units are located, voluntarily agreed to designate a largely contiguous area crossing all three of the main basins and several of the sub-basins in the Permit Area. This land is composed of both high and low quality wetlands (10,084 acres) as well as uplands (3,116 acres).

[4] Although St. Joe now owns all the areas designated for conservation units, other landowners may make arrangements with St. Joe to use land designated for conservation as part of a landowner's on-site mitigation plans (just as those landowners can make arrangements with St. Joe to "buy credit at one of St. Joe's mitigation banks). The permit requires St. Joe to convey conservation easements over land in the designated conservation units (whether that land is upland or high or low quality wetlands) at an annual rate tied to the percentage of total acreage of wetlands impacted each year by all authorized projects (regardless whether they are "St. Joe projects" or not). Using that formula, the full 13,200 acres of conservation unit land would be placed under perpetual protection by the time the Permit Area is fully developed.

few sub-basins that are wholly contained within a mitigation bank, in which case no wetlands are available for development). The area within a sub-basin used to calculate these percentages does not include any designated conservation unit areas. Thus, for the sub-basins containing designated conservation unit areas that contain wetlands, which is most of the sub-basins in the Permit Area, more than 80% of the wetlands will be preserved. Therefore, more than generally authorizing dredge and fill activities in the Permit Area, the Permit imposes numerous restrictive conditions and oversight procedures designed to conserve large portions of the Permit area and minimize the impact of the dredging and filling activities.

Because the Corps selected a general permit to deal with this area of the Florida panhandle, it need not follow Section 404(a)'s individual permitting process for individual projects authorized under the Permit. Instead, the Permit provides for an internal review scheme for each proposed project. Special Condition 20 establishes the individual project approval procedures, which include a pre-application meeting to which representatives of the Corps, Florida Department of Environmental Protection, Environmental Protection Agency, U.S. Fish and Wildlife Services, National Marine Fisheries Services, and Northwest Florida Management District are invited to evaluate whether any individual

6

proposed project meets the requirements and criteria of the Permit and to discuss the proposed project design.

At the pre-application meeting, the project sponsor is required to produce a description of the scope of the proposed project and its specific location and boundaries; an identification, delineation and mapping of all wetlands in the project area; a description of proposed wetlands impacts and compliance with the Permit; engineer certifications of stormwater treatment plans; documentation of coordination with the State Historic Preservation Officer and compliance with any archeological or historical surveys required by that agency; documentation of site evaluation for the presence of flatwoods salamanders, bald eagles, and telephus spurge (which the Corps' Biological Assessment has identified as threatened or endangered species in the Permit area); and, where appropriate, evidence of compliance with guidelines for the preservation of these species.

After the pre-application meeting, a landowner can formally submit an application, which includes a final form of exhibits and information considered at the pre-application meeting. If a proposed project fails to meet the terms of the Permit, it may be submitted for consideration under the Act as an individually permitted project, to be evaluated in accordance with the individual permit application process. But, if the Corps determines that a proposed project does

7

meet the Permit's terms, the Corps may issue a letter of authorization. These letters can be conditioned upon the satisfaction of additional special conditions deemed necessary by the Corps to minimize adverse environmental impacts. Only after receipt of an authorization letter may a landowner begin to undertake dredge and fill activities in the Permit area.

Other portions of the Permit operate to minimize environmental impacts and merit mention. For example, Special Conditions 1 and 2 require that individual projects include specific stormwater treatment plans that set higher standards for stormwater discharge than Florida's current stormwater treatment requirements for the region. For projects occurring in a designated area, Special Condition 1 adopts all the conditions of an Ecosystem Management Agreement ("EMA") between the Corps and St. Joe. (The EMA has its own water quality certification standards and stormwater treatment measures that the Corps asserts are also more stringent than current state requirements.) The Corps explains that through the EMA, the Corps is able to place additional restrictions on developments by St. Joe.

Additionally, Special Condition 9 requires that only clean fill and rock material be used for wetland fills, which the Corps explains will minimize the effect of any erosion of fill materials used in a particular project, which in turn minimizes the effect on the circulation, fluctuation, and salinity of receiving

8

waterbodies and further ensures that suspended particulates from authorized activities will be unlikely to affect the turbidity of receiving waters or wetlands.

Special Condition 7 requires 30 to 100 foot buffers between all development projects and Lake Powell, the largest coastal dune lake in the Florida panhandle. These buffers are to be preserved and maintained in an essentially natural condition without the use of fertilizers, herbicides or pesticides, which the Corps explains will serve to protect the lake's water quality. Similarly, Special Condition 8 requires that all projects buffer high quality wetlands by low quality wetlands or uplands that must be preserved and maintained in an essentially natural condition, without the use of fertilizers, herbicides or pesticides.

Special Condition 10 minimizes the impact to the wetlands and their dependent environmental resources by prohibiting wetland fill from severing important existing jurisdictional connections or from isolating jurisdictional areas.

We are acutely aware of Appellants' legitimate concerns over abuse of the general permitting process. Left unchecked, expanding the use of Section 404(e) general permits beyond their statutory scope would gut the individual permitting process and allow the Corps to circumvent the notice and public hearing requirements of Section 404(a). In response to Appellants' legitimate concerns over the Corps' use of a general permit of this unprecedented scope, the best

9

argument made by the Corps is that we should grant deference to its interpretation regarding the conditions under which it may issue a general permit under Section 404(e) of the Act.

The Corps has issued no regulation or formal interpretation defining the key terms at issue in this case. Therefore, we are left only with the language of the Act and the Corps' application of the general permitting scheme in this instance. We note that the district court wrestled with this case in a thoughtful opinion and over a lengthy period of time. The district court initially issued a preliminary injunction enjoining issuance of the Permit but, after further consideration of the facts and law, it reversed itself. Like the district court, we have carefully reviewed the record and relevant law, agonized over the facts, and concluded that this case is extremely close.

The special conditions in the Permit are extensive, and we believe they reflect the Corps' efforts to design a permit that is considerate of the Act and yet tailored to the unique problems presented by this large area of northwest Florida. The Permit both strategically manages development in the entire Permit Area and provides the Corps wide powers to control adverse impacts associated with any particular individual project. We ultimately agree with the district court's reasoning that the Permit, largely through these special conditions, is within the

scope of Section 404(e), limiting the type of activities allowed so they are "similar in nature" and mitigating any environmental impacts so they are minimal. We conclude this Permit is within Congress' grant of authority to the Corps to issue general permits.

**AFFIRMED.**