[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10418
_____

D.C. Docket No. 5:10-cv-00602-WTH-PRL


REDUS FLORIDA COMMERCIAL, LLC,

Plaintiff - Appellant,

versus


COLLEGE STATION RETAIL CENTER, LLC,
a Florida limited liability company,
JOSEPH E. ZAGAME, SR.,
JANE C. ZAGAME,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 19, 2014)

Before TJOFLAT, WILLIAM PRYOR and MARTIN, Circuit Judges.

TJOFLAT, Circuit Judge:

This case asks us to determine what a United States Marshal ("Marshal") collects when he auctions property at a public judicial sale. 28 U.S.C. § 1921(c)(1) entitles the United States Marshals Service ("USMS") to

> a commission of 3 percent of the first $1,000 <u>collected</u> and 1 $^{1}/_{2}$ percent on the excess of any sum over $1,000, for seizing or levying on property (including seizures in admiralty), disposing of such property by sale, setoff, or otherwise, and receiving and paying over money, except that the amount of commission shall be within the range set by the Attorney General.

(emphasis added).[1]  In a case where the judgment creditor prevailed at a foreclosure sale with an arguably "nominal" bid, the District Court determined that "collected" refers to the lesser of the amount of the creditor's judgment lien, or, if established, the appraisal value of the property under foreclosure.  Because the judgment creditor failed to establish the property's appraisal value, the District Court calculated the USMS's commission based only on the amount of the judgment lien.

The judgment creditor appeals, arguing that "collected" instead refers to the amount of his winning bid.  Because we find that the plain meaning of "collected"

---

[1] Written as an equation, 28 U.S.C. § 1921(c)(1) prescribes the following:

$$f(x) = \begin{cases} x(0.03) & , \quad x \leq \$1,000 \\ \$1,000(0.03) + (x - \$1,000)(0.015), & \quad x > \$1,000 \end{cases}$$

with $f(x)$ being the USMS commission, and $x$ being the amount collected. At bottom, this case asks us to define $x$.

2

in 28 U.S.C. § 1921(c)(1) refers to the amount of the accepted winning bid, we vacate the District Court's judgment and remand for proceedings consistent with this opinion.

## I.

This case began when Redus Florida Commercial, LLC ("Redus") filed a foreclosure complaint against Joseph E. Zagame, Sr. and Jane C. Zagame in the United States District Court for the Middle District of Florida.  After over a year of pretrial litigation, the parties entered into a settlement agreement that yielded a joint stipulation for Entry of Final Judgment of Foreclosure.[2]

The District Court granted the parties' Motion for Entry of Final Judgment of Foreclosure, finding that Redus held a valid and enforceable mortgage lien for $11,832,307.14 on the Zagames' property.  The District Court then directed the USMS[3] to sell that property "at public sale . . . to the highest bidder for cash" to satisfy this judgment.  Redus was allowed to bid on credit at the auction up to the total amount of its judgment.

---

[2] This settlement agreement contained a promise by Redus not to seek a deficiency judgment.

[3] The parties' proposed Final Judgment of Foreclosure envisioned that "the Clerk of [the District] Court" would handle the foreclosure sale.  See generally Doc. 52-1.  The actual Final Judgment of Foreclosure replaced references to the clerk with references to the Marshal.  See Doc. 55.

3

Under 28 U.S.C. § 1921(c)(1), the USMS is entitled to a commission, calculated as a percentage of the amount "collected" at auction, for conducting foreclosure sales on behalf of private litigants.[4]  Prior to the public auction, Frank Tallini, the Deputy U.S. Marshal tasked with handling Redus's sale, informed Redus that, when the judgment creditor prevails at auction with a "nominal" bid, it is USMS policy to calculate the statutory commission based upon the lesser of the amount of the creditor's judgment or, if established, the appraised value of the property.  Although the USMS Policy Directive ("Directive") did outline this procedure, that document provided no guidance as to what constitutes a "nominal" bid (besides that $1 might qualify).  U.S. Marshals Serv., Fees, Expenses, and Commissions D.1.d (2009), in Policy Directive 11.1, available at http://www.usmarshals.gov/foia/directives/service_of_process.pdf.[5]  Furthermore, the USMS's proposed procedure stood in stark contrast with recent USMS practice.  On at least fourteen occasions after Redus filed its complaint but before

---

[4] Pursuant to his authority under § 1921(c)(1), the Attorney General has promulgated regulations establishing the permissible dollar range for USMS commissions: "[T]he amount of commission shall not be less than $100.00 and shall not exceed $50,000."  28 C.F.R. § 0.114(h) (2012).  Using the equation prescribed in § 1921(c)(1), any amount "collected" greater than $3,332,333.33 yields the maximum commission of $50,000.

[5] There was some dispute as to whether the Directive was publicly available when the USMS first became involved in this case.  Nonetheless, it is clear that the Directive existed in some form as early as 2005.  See Small Bus. Loan Source, Inc. v. F/V St. Mary II, 361 F. Supp. 2d 570, 573 (E.D. La. 2005) (quoting an identical version of the Directive).  Portions of the Directive publicly available on the USMS's website indicate that the Directive was last updated in January 2009, though it is not clear that the document's individual sections all have the same publication date.

4

the Marshal in this case held the foreclosure sale, other Marshals had calculated the USMS commission based upon the amount of the arguably "nominal" winning bid at auction.  Doc. 70-2.

Believing that the application of the USMS's interpretation of "collected" would result in a commission of $50,000—an amount $49,930 in excess of what Redus would pay the Florida state clerk for the same service, see Fla. Stat. § 45.035(1), and $49,900 more than the USMS had charged in many materially indistinguishable recent dealings, see Doc. 70-2—Redus filed an emergency motion asking the District Court to resolve the interpretive dispute in its favor, or, in the event that the District Court agreed with the USMS's interpretation of "collected," to allow Redus to cancel the sale so that Redus could foreclose on the property in state court.  The District Court granted in part and denied in part Redus's motion.  It declined to interpret the statute and refused to cancel the sale, but reassured Redus that "the United States Marshal's commission shall be determined in accordance with 28. U.S.C. § 1921(c) and 28 C.F.R. § 0.114(h)." Doc. 61, at 1.

At the auction, Redus was the sole bidder and prevailed with a bid of $100. Because the USMS deemed this bid "nominal," and because neither the USMS nor Redus had established an appraisal value for the property, the Marshal calculated the USMS commission based not upon the $100 bid, but on the judgment value of

$11,832,307.14.  This yielded a commission of $50,000.[6]  Redus, however, refused to relinquish any additional money to the USMS, presumably on the belief that § 1921(c)(1) only entitled the USMS to $100, and that the $100 bid fully satisfied that amount.  In response, the USMS withheld issuance of the marshal's deed pending Redus's payment of the full $50,000.  Redus then moved the District Court to compel the USMS to calculate its commission based on the $100 sales price and to issue the deed.   The District Court responded by directing the USMS to issue the deed as soon as Redus posted a surety bond for the full $50,000 in the event that the USMS's interpretation of § 1921(c)(1) prevailed.  Redus posted the bond, and the USMS delivered the deed.

On December 31, 2012, the District Court reached a conclusion regarding the meaning of "collected."  Finding "the holdings in Small Business Loan Source, Inc., and Centennial Bank to be persuasive and correct interpretations of § 1921(c)," the court concluded that "[e]ven when the [Directive is] afforded no deference, the term 'collected' in § 1921(c)(1) must mean the lesser of the amount

---

[6] In total, the Marshal charged $53,347.73.  Doc. 62, at 2.  That figure breaks down as follows:
　　Service Fees: $275 ($55 per hour for five hours of work)
　　Mileage Reimbursement: $98.73 (193.6 miles at $0.51 per mile)
　　Advertising Costs: $2,954 (for advertising in the Orlando Sentinel[,] Lake County Edition)
　　Document Preparation: $20
　　USMS Commission: $50,000 (based on judgment value of $11,832,307.14)
Total Fees/Costs/Commission: $53,347.73.

of the judgment lien or the appraised value of the property (if available)." [7]  Doc. 80, at 8.  Using the judgment value as the reference number, the District Court accordingly awarded the USMS a commission of $50,000 for its work.  On January 24, 2013, Redus lodged this appeal.[8]

II.

Section § 1921(c)(1) entitles the USMS to a percentage of the amount "collected . . . for seizing or levying on property (including seizures in admiralty), disposing of such property by sale, setoff, or otherwise, and receiving and paying over money."  Redus argues that "collected" refers to the high bid the USMS accepts at auction.  The USMS agrees with this interpretation in all cases except those where "a judgment creditor . . . submit[s] a credit bid of a nominal sum."  U.S. Marshals Serv., Fees, Expenses, and Commissions D.1.d. (2009), in Policy Directive 11.1, available at http://www.usmarshals.gov/foia/directives/service_of_process.pdf.  Under these

---

[7] In Small Business Loan Source, Inc. v. F/V St. Mary II, 361 F. Supp. 2d. 570 (E.D. La. 2005) the District Court did defer to the Directive, finding that it was "logically coherent and consistent with long-standing judicial precedent."  Id. at 575.  Unlike the court in F/V St. Mary II, the District Court in Centennial Bank v. Roddenberry, 892 F. Supp. 2d 1317 (N.D. Fla. 2012), did not defer to the Directive.  Id. at 1320.  Rather, the Centennial Bank court held that "a proper reading of the statute calls for the Marshal's statutory percentage fee to be calculated based on the lesser of the judgment amount or the property's value."  Id.

[8] In its brief, Redus effectively abandoned its argument that the District Court abused its discretion when it refused to grant Redus's emergency motion to cancel the foreclosure sale.  See Appellant's Br. 13; Appellee's Br. viii.  We therefore do not consider that issue in this appeal.

7

circumstances, the USMS interprets "collected" to refer to the lesser of the "amount of the judgment lien or, if established, the appraised value of the property under levy." Id.  We conclude that Redus's interpretation is correct.

### A.

We review questions of statutory interpretation de novo.  United States v. Moore, 541 F.3d 1323, 1326 (11th Cir. 2008).  This undertaking begins—and frequently ends—with the text's plain meaning.  See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 112 S. Ct. 1146, 1149, 117 L. Ed. 2d 391 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says.  When the words of a statute are unambiguous . . . judicial inquiry is complete." (citations omitted) (quotation marks omitted)); Johnson v. Governor of Fla., 405 F.3d 1214, 1247 (11th Cir. 2005) (en banc) ("The first step in statutory interpretation requires that courts apply the plain meaning of the statutory language . . . .").  Generally, "[w]ords are interpreted with their ordinary and plain meaning because we assume that Congress uses words in a statute as they are commonly understood." United States v. Veal, 153 F.3d 1233, 1246 (11th Cir. 1998), abrogated on other grounds by Fowler v. United States, ___ U.S. ___, 131 S. Ct. 2045 (2011).  Finally, a "[r]eview of legislative history is unnecessary unless a statute is inescapably ambiguous." Veal, 153 F.3d at 1233 (quotation marks omitted).

8

B.

We start with the text.  Section 1921(c)(1) of Title 28 of the United States Code provides, in relevant part:

> The United States Marshals Service shall collect a commission of 3 percent of the first $1,000 collected and 1 $\frac{1}{2}$ percent the excess of any sum over $1,000 for seizing or levying on property (including seizures in admiralty), disposing of such property by sale, setoff or otherwise, and receiving and paying over money, except that the amount of commission shall be within the range set by the Attorney General.

To begin, we note that the statute envisions that a specific amount of money is to be collected, and that the commission is to be based on that sum.  See id. (referring to "3 percent of the first $1,000 collected and 1 $\frac{1}{2}$ percent on the excess of any sum over $1,000" (emphasis added)).  Looking to the acts the USMS must perform to earn this commission, we see only one that entails "collecting" money: the "receiving and paying over [of] money."  This receipt of money can only refer to the USMS's receipt of the winning bid—collected when it "dispos[es] of [the] property by sale"—and transfer of that bid to the judgment creditor in satisfaction of his judgment.  This remains true even when a judgment creditor bids on credit.[9]  Accordingly, the amount "collected" under the statute is the amount the USMS

---

[9] The USMS concedes as much, see U.S. Marshals Serv., supra, at D.1.d, for it must.  If accepting a bid made on credit and then crediting that amount against the judgment to be satisfied did not constitute the receipt and paying over of money, the USMS would not be entitled to any commission.  See 28 U.S.C. § 1921(c)(1).

9

accepts as the winning bid, i.e., the property's sale price.  In this case, the USMS

helpfully provided this figure: $100.

Indeed, the USMS only disagrees with this interpretation when "a judgment

creditor . . . submit[s] a credit bid in a nominal sum . . . in an attempt to avoid

payment of the USMS commission."  U.S. Marshals Serv., supra, at D.1.d.  The

statute is bereft of language suggesting that the reference number for calculating

the commission changes depending upon the bid amount or bidder's intent.

Contingent plans for low bids and references to either "[t]he amount of the

judgment lien" or "the appraised value of the property under levy," see id., simply

do not appear in § 1921(c)(1).   "Collected" refers to the actual amount the USMS

receives at auction: the winning bid.  That many Marshals calculated the USMS

commission based upon that understanding of "collected" before, during, and after

the disputed sale to Redus should dispel any lingering doubts on the matter.[10]  See

---

[10] This alone might have been dispositive were we construing ambiguous contractual
terms rather than statutory language.  By way of analogy, we view § 1921(c)(1) as providing the
terms to an offer made by the USMS to a prospective mortgagee, such that the mortgagee's
decision to proceed with the foreclosure in federal court—rather than another forum—amounts
to a tacit acceptance of the offer. If we were to accept that "collected" is an ambiguous term in
this agreement, it would then be proper to look to extrinsic evidence to determine the parties'
subjective understanding of the contract.  Feaz v. Wells Fargo Bank, N.A., 745 F.3d 1098, 1104
(11th Cir. 2014).

One source of extrinsic evidence is usage.  See Arriaga v. Fla. Pac. Farms, L.L.C., 305
F.3d 1228, 1247 (11th Cir. 2002).  That the USMS historically interpreted the amount
"collected" to be the amount of the winning bid—and that Redus had no notice of the USMS's
intent to calculate its commission based upon the Directive's instructions—provides powerful
parol evidence suggesting that Redus's interpretation is correct.  See also Harris Corp. v.

10

Doc. 70-2 (demonstrating that on fourteen separate occasions between when Redus filed its complaint and when the judicial sale occurred, other individual Marshals calculated the USMS commission based upon the sales price despite the fact that the judgment creditor prevailed via an arguably nominal credit bid). Although the Government suggested at oral argument that these Marshals simply erred by not following the Directive, we give the individual Marshals more credit. They understood that the USMS commission is statutorily tied to the amount "collected," and sensibly realized that the only thing they collected was the winning bid.

Because the USMS collected $100 here, it is entitled to a commission of $100.[11]

## C.

That the statute entitles the USMS to a <u>commission</u> further bolsters this conclusion. In addition to providing a commission for facilitating public auctions, 28 U.S.C. § 1921(c)(1), Congress allows the USMS to collect "fees" for various

Giesting & Assocs., 297 F.3d 1270, 1273 (11th Cir. 2002) ("A party who willingly and without protest enters into a contract with knowledge of the other party's interpretation is bound by such interpretation and cannot later claim that it thought something else was meant." (quotation marks omitted)). Because we are not interpreting a contract here, prior USMS calculations are relevant only to the extent that they reveal a common-sense meaning for "collected."

[11] Using the statutory formula yields a commission of $3. However, the Attorney General has set the floor for USMS commissions earned under § 1921(c)(1) at $100. 28 C.F.R. 0.114(h). Accordingly, the USMS is entitled to $100.

11

other tasks they perform for private litigants, see 28 U.S.C. § 1921(a)(1) (allowing the USMS to "routinely collect . . . fees" for tasks such as keeping attached property, preparing notices of sale, and serving writs of execution).  Because we must presume that Congress says what it means and means what it says, CBS Inc. v. Prime Time 24 Joint Venture, 245 F.3d 1217, 1221 (11th Cir. 2001), we take note when it uses a different term—"commission"—in one subsection but not another,  see generally 28 U.S.C. § 1921.[12]

A "commission" is "a percentage of the money received in a sale or other transaction paid to the agent responsible for the business."  Webster's Third New International Dictionary 457 (1993).  If one reads "collected" to be the money the USMS receives when functioning as auctioneer, § 1921(c)(1) dovetails perfectly with this definition.  In this context, Marshals are agents of the court, United States v. Peters, 777 F.2d 1294, 1297 (7th Cir. 1985), who receive as their commission a percentage of the money they collect at auction.

Equally important, however, is why Congress or anyone else would allow its agents a commission.  Generally, employers institute commissions to incentivize hard work.  The theory goes that by giving employees a percentage of the sales

---

[12] Congress first allowed the USMS a "commission" on sales outside of admiralty in 1962.  See H.R. Rep. No. 87-1724, at 5 (1962).  Prior to this, the USMS received "the same fees and poundage as are or shall be allowed for similar services to the sheriffs of the States, respectively, in which the service is rendered," for non-admiralty sales.  Id.  Congress did not elaborate on its usage of "commission" in the accompanying legislative reports.  See id.

12

they make, an employer can align his employee's interests with his own. Accordingly, we assume that Congress established a commission system to align the USMS's interests with some of its own: protecting debtors and ensuring the judicial system's integrity.

The need to protect debtors at foreclosure sales is real. If the sales price at a judicial sale does not fully satisfy a judgment creditor's judgment—as is certainly the case when a nominal bid prevails—the creditor can generally seek a deficiency judgment to recover the balance of the debt. 5 Herbert Thorndike Tiffany, The Law of Real Property § 1529 (3d ed.); see, e.g., Fla Stat. § 702.06 (2014) ("In all suits for the foreclosure of mortgages heretofore or hereafter executed the entry of a deficiency decree for any portion of a deficiency, should one exist, shall be within the sound discretion of the court . . . ."). Although courts today generally calculate deficiency judgments as the difference between the total debt and the property's fair market value, they also generally presume that the foreclosure sales price equals the property's fair market value. See, e.g., Vantium Capital, Inc. v. Hobson, 137 So. 3d 497, 499 (Fla. 4th Dist. Ct. App. 2014).

It is therefore up to the debtor—the financially distressed party whose default on his obligations precipitated the foreclosure in the first place—to muster the necessary counsel and appraisers to rebut that presumption, lest he be saddled with a crushing deficiency judgment. One might have previously assumed that

13

creditors would not seek deficiency judgments against such a debtor; if the debtor is so destitute that he cannot even mount a defense, why spend resources trying to get blood from a stone?  See Steven Wechsler, Through the Looking Glass: Foreclosure by Sale as De Facto Strict Foreclosure—An Empirical Study of Mortgage Foreclosure and Subsequent Resale, 70 Cornell L. Rev. 850, 871 (1985) (noting that "mortgagees made virtually no attempt to obtain deficiency judgments" despite the fact that eighty percent of the foreclosure sales included in a random sample of mortgage foreclosures left deficiencies).  However, this practice may be changing as banks assign deficiency judgments to debt collectors. Jessica Silver-Greenberg, House Is Gone but Debt Lives On, Wall St. J., Oct. 1, 2011, at A1.  Accordingly, successful nominal bids may very well doubly injure debtors in ways unseen since the Great Depression.  See Wechsler, supra, at 861 (noting that, during the Great Depression, "[mortgagees] were again making foreclosure purchases at low prices and were then frequently using those low prices as the basis to vigorously pursue deficiency judgments against mortgagors").

Why does nominal bidding occur?  The only reason a nominal bid prevails is because no one else shows up to bid.[13]  This lack of attendance could have various

---

[13] Two district courts have asserted that nominal bids may prevail because third parties must submit, at a minimum, bids that satisfy the entire lien.  F/V St. Mary II, 361 F. Supp. 2d at 572; Caterpillar Fin. Servs. Corp v. Mr. C II, No. Civ.A.03-228, 2003 WL 22038378, at *3 (E.D. La. Aug. 19, 2003).  We are mystified as to why this would be the case.  F/V St. Mary II cites

causes.  It could be that the notice was legally insufficient.  Perhaps the creditor fraudulently prevented third parties from bidding.  It could also be—as we suspect is the case here—that third parties were aware of the sale and could have bid, but declined to do so because risks and uncertainties surrounding the property were too great.  See Ronald Goldstein, Reforming the Residential Mortgage Foreclosure, 21 Real Est. L.J. 286, 289–90 (1993) (noting that third parties face such great informational asymmetries compared to mortgagees that they may rationally find bidding unattractive).  Finally, it might be that the property is worthless.  Whatever the reason, in cases where there is a nominal bid, debtors risk a double loss, facing both the loss of the foreclosed property (and whatever equity they may have had in it) and a sizeable deficiency judgment.

---

Caterpillar Financial Services Corp. for support, 361 F. Supp. 2d at 572, and Caterpillar Financial Services Corp. cites nothing, 2003 WL 22038378, at *3.  The district courts apparently did not order such restrictions on bid amounts.  If the USMS was the source of this restriction, they may have exceeded their discretionary authority.  Furthermore, we note this restriction would chill third-party bidding, and thereby allow the judgment creditor to prevail via a nominal bid. This effectively allows the USMS to receive inflated commissions.  See infra note 15.

It would also be incorrect to assume that third parties do not show up because of the judgment creditor's ability to bid up to his judgment amount without having to actually tender money.  Even if a third party placed the same or less value on the property as the judgment creditor, it could nonetheless be economically sound to let the third party prevail.  This is so for two reasons: First, a post-auction sale by a judgment creditor would entail additional transaction costs.  See  Ortiz v. Fibreboard Corp., 527 U.S. 815, 860–61, 119 S. Ct. 2295, 2321–22, 144 L. Ed. 2d 715 (1999) (noting that any additional efforts to recover on claims entails transaction costs that necessarily reduce total recovery).  Second, given the time-value of money, the purchase price is worth more to a judgment creditor today than it is at some future time.  See Gates v. Collier, 616 F.2d 1268, 1276 (5th Cir. 1980) ("[A] dollar today is worth more than a dollar in the future.").

Enter the USMS and its commission.  Under our interpretation of "collected"—that it refers to the high bid the USMS collects at auction—the USMS has an incentive to suspect and perhaps challenge a nominal bid.[14]  It may be that the bid is untainted and that no one will ever outbid the judgment creditor.  That is fine; the fact is that the USMS has everything to gain by questioning the bid's legitimacy given that a higher bid will result in a higher commission.  In this scenario, the USMS protects both the debtor and the court's integrity by ensuring sound sales.  This commission aligns the USMS's financial interests with its employer's aims: justice and fair play.

Under the USMS's interpretation of "collected"—that it refers not to the high bid the USMS collects, but instead refers to the lesser of the judgment or, if established, the property's appraisal value if a judgment creditor prevails via a nominal bid—the USMS possesses no incentive to verify sales.  Rather, it

---

[14] Sales of land at public auction are contracts, Blossom v. R.R. Co., 70 U.S. 196, 205 (1865), to which the high bidder and the court are parties, id at 207.  At a judicial sale, the court is the vendor, while the Marshal serves as its agent.  See id.  The call for bidding at the public auction is not the relevant offer; rather, the bids themselves are offers to the court.  First Nat'l Bank of Jefferson Parish v. M/V Lightning Power, 776 F.2d 1258, 1261 (5th Cir. 1985).  Accordingly, there is no sale prior to judicial confirmation.  Id.

This power to accept or reject bids allows courts or their agents to set aside inequitable sales.  See Blossom, 70 U.S. at 209 (holding that a sheriff, acting as an agent of the court, may decline to conclude an auction "if he sees that [the sale] will be likely to produce great sacrifice of the property").  Although "equity will not set aside a sale for mere inadequacy of price, it will do so if the inadequacy is so great as to shock the conscience or if there are additional circumstances against its fairness, such as chilled bidding." Gelfert v. Nat'l City Bank of N.Y., 313 U.S. 221, 232, 61 S. Ct. 898, 902, 85 L. Ed. 1299 (1941).

16

possesses an incentive to turn a blind eye. Individual Marshals must grapple with the temptation to look the other way given that a nominal bid will almost certainly result in a commission greater than they would have received had there been competitive bidding.[15] That is, under the USMS's interpretation, we must accept

---

[15] The USMS appears to use the creditor's judgment amount and the property's appraisal value as proxies for what the property would have sold for had there been competitive bidding at the auction. However, it is nearly certain that both represent values far greater than the property's hypothetical sales price at a forced auction. First, we note that almost by definition, there will not be foreclosure sales of property whose appraisal value eclipses its judgment value. Were this the case, the debtor could sell the property, repay his debt, and keep the excess for himself (or turn it over to subordinate lienholders).

Accordingly, if either the creditor or the USMS establishes the appraisal value, that value will—under the USMS's proposed interpretation—almost always set the amount "collected." One definition of "appraised value" is the value an item sells for at a properly noticed auction that is free from fraudulent machinations. Given that neither the USMS nor the court raised any problems with this sale, as evidenced by the court's confirmation, this definition describes precisely what happened here: the sale for $100. Such a conclusion would be consistent with the widely applicable and long-held presumption that a property's sales price at a valid judicial sale is conclusive as to the property's value. See, e.g., Etter v. State Bank of Fla., 79 So. 724, 726 (Fla. 1918).

Obviously, however, the parties would not have litigated this case were that what the USMS meant by "appraised value of the property under levy." Instead, the USMS likely means the property's "fair market value"; after all, this is generally what appraisers determine. See e.g., United States v. 480.00 Acres of Land, 557 F.3d 1297, 1304 (11th Cir. 2009) (noting that "[a] certified appraiser testified as to the fair market value of the seven parcels"); Anselmo v. Comm'r, 757 F.2d 1208, 1210 (11th Cir. 1985) ("Each of these appraisers followed the same path of reasoning to arrive at the fair market value . . . .").

The problem is that "fair market value" has nothing whatsoever to do with the value received at public auctions. "Fair market value" is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction." Black's Law Dictionary 1691 (9th ed. 2009). Foreclosure sales are, by definition, forced sales and obtain prices far below fair market value. BFP v. Resolution Trust Corp., 511 U.S. 531, 537–538, 114 S. Ct. 1757, 1761, 128 L. Ed. 2d 556 (1994) (noting that fair market value is "not the price which might be obtained on a sale at public auction for a sale forced by the necessities of the owner" (quoting Black's Law Dictionary 971 (6th ed. 1990))). "Market value, as it is commonly

the untenable proposition that Congress meant to incentivize the USMS to rubber

stamp potentially tainted sales.  This cannot possibly be correct.  Congress entitled

the USMS to a commission for the same reason as every other employer: to give its

agents a stake in a job well done.  Our plain-meaning interpretation of "collected"

does just that.

Because we find that "collected" unambiguously refers to the winning bid

the USMS receives at auction, it is unnecessary to look to the Directive for

---

understood, has no applicability in the forced-sale context, indeed, it is the very antithesis of forced-sale value."  Id.  at 537, 114 S. Ct. at 1761.

As in this case, a foreclosure sale must occur within a certain time frame.  This restriction puts potential third-party bidders at an "informational disadvantage relative to the [mortgagee]," who will know "the condition of the property, its value, the neighborhood in which it is located, its problems, and all of the other considerations which go into the calculation of an informed bid."  Goldstein, supra, at 289.  "An appraiser's reconstruction of 'fair market value' could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure."  BFP, 511 U.S. at 539, 114 S. Ct. at 172.  However, "property that must be sold within those strictures is simply worth less."  Id., 114 S. Ct. at 172.  All of this contributes to the "general recognition in the common law that foreclosure purchases are rarely comparable to the fair market value of the property."  Rosen v. Hunter, 224 So. 2d 371, 375 (Fla. 1969).

Accordingly, calculating the commission based upon the property's appraised value will almost certainly yield a greater commission than would have been available had there been competitive bidding.  There is another wrinkle.  Under the USMS interpretation, it is only necessary to use the appraised value if either side establishes that value.  In many cases, the creditor may not establish that value.  For whatever reason, Redus did not do so.  In the USMS's view, it is now free to calculate its commission as if the property sold for its full judgment amount. We doubt that it is possible for anyone who has lived through the recent subprime mortgage crisis to credibly claim it reasonable to presume a mortgagor's indebtedness is equal in value to the property he holds.  Though the amount of a nominal bid may be at sea, the amount of a creditor's judgment can hardly claim sounder moorings.

The end result is that in nearly every case, resort to the Directive would result in greater commissions than the USMS would have received had there been competitive bidding.

18

guidance.  Sierra Club. v. U.S. Army Corps. of Eng'rs, 508 F.3d 1332, 1334 n.1 (11th Cir. 2007) (per curiam).

### III.

We reach this conclusion fully aware that "the amount of a nominal bid is a meaningless number, divorced from anything of substance."  Centennial Bank v. Roddenberry, 892 F. Supp. 2d 1317, 1320 (N.D. Fla. 2012).  We are nonetheless constrained by the statute's plain meaning: the only thing that the USMS collects is the winning bid at auction.  It may be that some alternative calculation should be instituted for cases such as this, but such a procedure simply cannot be found in the text of the statute before us.  "[A]n agency may not rewrite clear statutory terms to suit its own sense of how [a] statute should operate."  Util. Air Regulatory Grp. v. EPA, ___ U.S. ___, 134 S. Ct. 2427, 2446, 189 L. Ed. 2d 372 (2014).  Furthermore, "[w]e are not at liberty to rewrite the statute to reflect a meaning we deem more desirable."  Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 228, 128 S. Ct. 831, 841, 169 L. Ed. 2d 680 (2008).  We therefore leave the task of legislating to Congress.[16]

---

[16] We can also say with certainty that appraisals in the judicial sale context are not a foreign concept to the legislative branch.  In private judicial sales, the court must "appoint three disinterested persons to appraise" the property to be sold.  28 U.S.C. § 2001(b).  Courts have no power to confirm a private sale at a price "less than two-thirds of the appraised value."  Id.  By contrast, public sales possess no statutory price protections beyond a district court's formidable power to dictate the sale's terms and conditions, id. § 2001(a),  and to confirm (or reject) sales, Citibank, N.A. v. Data Lease Fin. Corp., 645 F.2d 333, 339 (5th Cir. Unit B 1981).

Regardless of whether it is true that "judgment creditors typically bid the amount of the debt owed," Appellee's Br. 8, nominal bids are old news.  See Robert M. Washburn, The Judicial and Legislative Response to Price Inadequacy in Mortgage Foreclosure Sales, 53 S. Cal. L. Rev. 843, 843 (1980) ("During the Depression of the 1930's, properties regularly sold for nominal amounts at foreclosure sales . . . .").  Congress has had ample time to alter the statute to account for this problem, but it has not done so.  As written, nothing in § 1921(c)(1)'s language compels judgment creditors (or anyone else) to bid in a certain amount lest they face drastically increased commission charges.  Like any bidder, judgment creditors need not inflate their bids (above what is necessary to prevail) to ensure that the USMS does not receive a hefty commission.

Even if the USMS's interpretation were to carry the day, we suspect it would be a pyrrhic victory.  In a foreclosure in a Florida state court, the clerk of court

---

Congress also enacted a provision somewhat similar to the USMS's proposed interpretation when it enacted the first version of § 1921 in 1853:

> In case the debt or claim shall be settled by the parties, without a sale of the property, the marshal shall be entitled to a commission of one per cent. on the first five hundred dollars of the claim or decree, and one half of one per cent. on the excess over five hundred dollars : Provided, That in case the value of the property shall be less than the claim, then, and in such case, such commission shall be allowed only on the appraised value thereof.

Act of Feb. 26, 1853, ch. 80, 10 Stat. 161, 164.  Both of these points reinforce the notion that the USMS's "interpretation" is legislative in nature. Unfortunately, the USMS is not free to legislate by scrawling an interpretation in the Directive.

charges $70 to facilitate a judicial sale.  Fla. Stat. § 45.035 (2014).  In a federal

diversity action, the USMS seeks to potentially charge over $50,000 for the same

service.[17]  It is difficult to imagine that a federal court's diversity jurisdiction is

worth $49,930 in judicial foreclosure cases where there is no competitive bidding.

The USMS's interpretation cannot possibly effectuate Congress's explicit intent

"to avoid raising the cost of litigation in the Federal courts to a prohibitive level"

when passing the current version of 28 U.S.C. § 1921(c)(1).[18]  H.R. Rep. No. 87–

1724, at 2 (1962).  The USMS's interpretation transforms diversity jurisdiction in

commercial foreclosure cases into a trap for the unwary.

Nonetheless, we doubt this trap would remain hidden for long.  To claim

legal malpractice under Florida law, a client must prove: (1) the attorney's

employment; (2) the attorney's neglect of a reasonable duty; and (3) the attorney's

negligence resulted in and was the proximate cause of loss to the client.  Larson &

Larson, P.A. v. TSE Indus., Inc., 22 So. 3d 36, 40 (Fla. 2009).  We cannot imagine

a clearer case for malpractice than that of the attorney who uses federal court—and

accordingly, the USMS—to facilitate a foreclosure sale for property worth any

---

[17] The USMS collects fees related to the sale in addition to its commission.  For example, the USMS collected $3,347.73 in fees from Redus entirely separate from the disputed commission.  Redus does not challenge the validity of these fees.

[18] In the same report, the Committee on the Judiciary also noted that the bill "would not unduly burden private litigants" because it provided only for a "moderate[] increase" in the costs charged to private litigants.  H.R. Rep. No. 87–1724, at 2 (1962).  A potential increase of $49,930 is anything but moderate.

21

significant amount, thereby needlessly wasting up to $49,930.  In this scenario, the hapless attorney will ultimately bear the cost of the USMS's interpretation.  We suspect he will learn to employ state court rather quickly, leaving the USMS with nothing.

We also note that that this decision does not somehow abolish the USMS's commission.  In the event that there is competitive bidding, the USMS will receive a commission just as it would in the past.  It is only when the nominal bid prevails—when no interested buyers appear at auction to drive up the price, leaving only the judgment creditor to protect his judgment—that the USMS will receive a reduced commission.[19]  If there are no procedural problems, and the truth is simply that no third party thinks it worthwhile to speculate on the property, we cannot imagine Congress intended to award the USMS an unpredictable windfall for a procedure that is a "sale" in name only.[20]  "Collected" refers only to the amount the USMS accepts as the winning bid at a public judicial sale.

Accordingly, we VACATE the District Court's computation of the USMS's commission and REMAND the case for further proceedings.

---

[19] Or an unchanged commission if we look to recent USMS practice.  See Doc. 70-2.

[20] The nominal bid does not relate at all to the price of the property.  The $100 Redus tendered was likely intended as a payment to the USMS for its services in transferring the property to Redus. Thus, the transaction was likely not a "sale" in the traditional sense.  If there were no sale, forget the $100; then the USMS would not be entitled to any commission.  See § 1921(c)(1) (requiring the USMS to dispose of the property by "sale, setoff, or otherwise.").

22

SO ORDERED.